COLE, Judge.
This dispute between landlord (appellee Cohn Realty Company, Inc.) and tenant (appellant Able Moving and Storage Company, Inc.) raises two issues. The first is whether or not the trial court erred in failing to award Able damages for Cohn’s breach of contract. The second is whether or not the court erred in awarding judgment based on the lease agreement in light of the fact the trial judge found there was no “meeting of the minds” as to the lease.
Cohn is the owner of a large two-story warehouse located on Europe Street in Ba *107 ton Rouge. The warehouse is from 75 to 100 years old. Able is a moving and storage business owned principally by three brothers: Gregory Constant, Clayton Constant and Rodney Constant. On September 28, 1977, Cohn’s representative, Isidore Cohn, and the Constant brothers entered into a lease agreement which provided for a base term of five years beginning October 1, 1977. For the first fifteen months Able was to lease the first floor of the building for $1,425.00 per month and a nearby vacant lot for $100.00 per month. Beginning January 1, 1979, or at an earlier date upon the election of Able, the second floor of the building fell under the lease at an additional rental of $1,140.00 per month.
The lease agreement specified fourteen improvements to be made by Cohn at the earliest possible date, such as repairs to the dock, steps, awnings, gutters, plumbing, floors, electrical system and other such items. For the first year of the lease Able paid the full amount due but made several oral and written complaints to Cohn about the various things needing repair. Beginning in October of 1978 Able began to pay only $525.00 per month, withholding the balance in an “escrow account” to be used to make the repairs Cohn had allegedly failed to make. Meanwhile, in June of 1978 Able had informed Cohn it desired partial occupancy of the second floor and the rental for this space was set at $380.00 per month for June 1978 through December 1978. Thereafter the rent for the second floor was to be $1,140.00 per month as originally set. Because of the dispute over the fourteen improvements Able withheld all rentals due for the second floor. As of May 1980, Able had withheld a total of $45,790.00 in rental payments.
Cohn filed suit against Able in November of 1978 seeking past due rentals and accelerated rentals for the remaining term of the lease.[1] Able answered in the form of a general denial and asserted a reconventional demand against Cohn [2] seeking damages for necessary repairs, compensation for personal injury and property damage caused by the condition of the building, and damages for loss of past, present and future revenues caused by Cohn’s failure to make the repairs. Able further alleged that it was entitled to a dissolution of the lease but because of the nature of its business an attempted relocation would cause irreparable harm.
After a lengthy trial on the merits judgment was rendered in favor of Cohn and against Able in the sum of $45,790.00. The lease was ordered dissolved as of the date the judgment became final (i. e., definitive). Able was ordered to vacate the second floor on the last date of the month in which the judgment became final and to vacate the first floor within six months of that date. Able was to pay the monthly rents as they became due for the remainder of its occupancy.
In his written reasons for judgment the trial judge noted it is well settled a tenant cannot simply refuse to pay the rent, even though the landlord may have breached his obligation to repair the leased premises, citing Cameron v. Krantz, 299 So.2d 919 (La.App. 3d Cir. 1974). The tenant does have the right to make the repairs himself and deduct these sums from the rent, as provided by La.Civ.Code art. 2694. The court recognized this right by rendering judgment on the reconventional demand in favor of Able and against Cohn for $10,372.34. This sum represents a credit given to Able for various repair expenses proven at trial.[3]
*108 Appellant Able argues the court erred in failing to award it damages sustained as a result of Cohn’s breach of the lease. The general measure of damages for such a breach is the amount of loss sustained and the profit of which the tenant has been deprived (within the contemplation of the parties at the time of the contract) due to the lessor’s breach. Reed v. Classified Parking System, 324 So.2d 484 (La.App. 2d Cir. 1975); La.Civ. Code art. 1934.
Able specifically contends it should have been granted damages for the increased labor expenses caused by the unsafe conditions of the floor and dock. The lease specifically provided the west dock would be repaired to accommodate a forklift and the floors would be repaired so that their condition was “secure and safe.” Various witnesses testified the floor was uneven and patched with thin plywood. The dock was allegedly unsteady and of insufficient strength and width to support adequately a forklift. The trial court concluded this was so. Able contends the inadequate floor and dock prevented it from using a forklift and caused it to use an eight-step process, thus increasing labor expenses.
Glenn Peck, Abie’s corporate accountant and expert witness, testified Abie’s warehouse labor costs for the year 1979 equalled $31,866.00 and in his opinion the costs would have been the same for the year 1978. Bruce NcNeal, accepted by the court as an expert in the moving industry, testified the condition of the dock and floors required Able to use the eight-step (soft palletization) moving process rather than the four-step (hard palletization) procedure. McNeal stated the longer process required 37% more labor than the shorter method. Based on these figures, appellants, argue the floor and dock conditions caused them to spend an additional $11,790.42 a year for labor, or a total of $23,580.84 for the two year period.
Although the trial court found the dock and ramp unable to support a forklift, it denied recovery for the increased labor allegedly caused by this condition on the basis that the amount of the damages was highly speculative. We disagree. After carefully examining the record we are convinced Able has proven by a preponderance of the evidence the inability to use the forklift cost them $23,580.84 in additional labor.
Rodney Constant testified Able had not been able to use the forklift (except in “life and death” situations) from the beginning of the lease. His brothers’ testimony substantiated this fact. We find the expert testimony of Mr. Peck and Mr. McNeal established adequately the amount of damage Able suffered because of the dock condition. Therefore, we amend that portion of the judgment granting damages to plaintiffs in reconvention (Able) to allow an additional sum of $23,580.84 as damages for the increased labor expense caused by the condition of the dock and ramp.
The second item for which appellant claims it should be allowed damages is the loss of revenues due to the lack of having its own name painted on the building. The lease specifically provided the lessor would “Remove the marking from the side of the building that contains the name of a prior tenant.” Testimony showed the old tenant’s name remained on the building until it was changed by Able in February of 1979. In October of 1978 Cohn sent workers who attempted to paint over the name of the old tenant. Able did not allow them to complete their job because Able had understood the old name would actually be removed from the building by sandblasting.
The trial court granted Able $2,650.00 for expenses incurred in removing the old name. Abie’s marketing expert, Dr. Steven DeVere, used a financial report prepared by Glenn Peck, performed a “trend analysis” to establish a pattern of revenue, and conducted a “market mix audit” to *109 determine what factors might have caused the change in revenue shown by the report. He concluded $181,487.00 in additional revenue was obtained after Able placed its own name on the building in February of 1979. He stated that had Abie’s name been on the building for the thirteen months preceding the change, Able would have earned $172,-418.00 more than it did during that period. (This figure was based on the $181,487.00 mentioned above, less 18% to account for growth rate.) Again, we must agree with the trial court that this item of damages is highly speculative.
Our conclusion is influenced by several factors. One is that there are obviously many variables affecting the revenue .generated by a business. During this time period Able changed its affiliation from Red Ball to Bekins. Further, the Constant brothers changed their emphasis from soliciting business for the “Able side” of the business to the “carrier side” of the business. These two factors alone could undoubtedly cause great fluctuations in the revenue generated.
Another factor is that Abie’s business is not a highly visible retail business in which a correct sign is reasonably necessary for its success. . Certainly if the Constants were running a grocery store or a restaurant they would have suffered severely by not having the proper identification on their building. However, the nature of the moving and storage industry is quite different from the retail business. Common sense and human experience dictate that very few people select their moving company by seeing its sign on a warehouse, nor would many people simply walk into a warehouse and decide to store their furniture there. Dr. DeVere admitted that the usual procedure is that a potential customer consults the phone book when seeking a moving or storage company, although he insisted many people make the contact after seeing the moving company’s sign. The warehouse is located on a rather obscure street in a part of town not well traveled by the general public. Therefore the visibility of a sign is not as imperative as it would be if the warehouse was located on a major thoroughfare. While we would not contend the lack of a proper sign could not have affected Abie’s business in some manner, there are too many other factors involved for us to accept Dr. DeVere’s report as being probative or persuasive. We therefore affirm the trial court’s refusal to award damages for this item.
Appellant argues alternatively that since the trial court found there was no “meeting of the minds” as to the contract, the court erred in awarding judgment based on the lease agreement. In other words, appellant urges since there was no meeting of the minds there was no valid contract. If there was no valid contract the court should not have ordered appellant to pay the past-due rent, because to do so was enforcing the terms of the (invalid) contract. Appellant contends the contract of lease should be ignored and the case remanded to the trial court to determine the “fair value” of the space occupied by Able, as well as the “fair value” of the repairs provided by Able.
We find no merit to this argument because the only error made was as to the qualities of the object of the contract. La. Civ. Code art. 1842 reads as follows:
“Error as to the thing, which is the subject of the contract, does not invalidate it, unless it bears on the substance or some substantial quality of the thing.”
An error as to substance occurs when the object is of a totally different nature from that which is intended. La.Civ. Code art. 1843. We cannot say that the object of this contract of lease (the warehouse) was of a totally different nature from that which is intended. Nor can we say the error related to the substantial quality of the object. Art. 1844 explains that the substantial quality of the object is that which gives it its greatest value, such as, “A contract relative to a vase, supposed to be gold, is void, if it be only plated with that metal.” If the error is as to the “other qualities” of the object (other than the substantial quality) the contract is invalidated only when those qualities are the principal cause of making *110 the contract. La.Civ. Code art. 1845. The principal cause is defined by art. 1825 as the motive, and means “that consideration without which the contract would not have been made.”
The facts reflected in the record indicate the principal cause of this contract was for Able to secure a large reasonably priced warehouse capable of receiving and storing household goods. There was no mistake as to the principal cause; the building was in fact capable of supporting a successful storage business and did so for several years. The only error or misunderstanding was as to the extent of the various repairs to be made and as to the ultimate condition of the building after the repairs were completed. It must have been apparent to the Constants that a 75 to 100 year old building would not be in “top-notch” shape even after the proposed repairs. Therefore it is not logical that their principal cause or motivation in entering the contract was to lease a building in perfect condition. These errors as to the condition of the building do not relate to the principal cause of the contract and therefore do not invalidate the lease. The trial court acted correctly in rendering judgment based on the lease.
For the foregoing reasons, the judgment of the trial court is amended to increase the amount awarded to Able by $23,580.84, plus legal interest from date of judicial demand until paid, for additional labor costs caused by the poor condition of the dock and ramp, equalling a total award of $33,953.27. In all other respects the judgment of the trial court is affirmed. The costs of the proceedings should be shared equally by appellant Able and appellee Cohn.
AMENDED, AND AS AMENDED, AFFIRMED.

. Also named as defendants were Isidore Cohn, Jr., Rosenthal and Associates and Robert Ro-senthal. The trial court found no liability on the part of these three defendants and dismissed the reconventional demand as to them.

. The lease provided that if the tenant failed to pay the rent (or violated any other condition of the lease) the lessor had the option to demand the entire rent for the whole term or to immediately cancel the lease.

.The trial court found these expenses were proven: $4,969.79 for repair to electrical wiring, $2,650.00 for the removal of the previous tenant’s name from the building and $500.00 needed for repairs to windows. A $2,252.64 credit was given for money Cohn received as a result of an insurance claim made for a damaged awning. The trial court concluded that since the awning was specifically listed as an item to be repaired, the tenant was entitled to this insurance money.